[No. B152304. Second Dist., Div. One. Aug. 29, 2002.]

LA COSTA BEACH HOMEOWNERS' ASSOCIATION et al., Plaintiffs and Respondents, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Appellant.

COUNSEL

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, J. Matthew Rodriquez, Assistant Attorney General, John A. Saurenman and Nedra E. Austin, Deputy Attorneys General, for Defendant and Appellant.

Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Patricia L. Glaser, Clare Bronowski and Elizabeth G. Chilton for Plaintiffs and Respondents.

OPINION

MALLANO, J.—The Legislature has declared that, under the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.; hereafter the Coastal Act), one of the goals of the California Coastal Commission (the Commission) is to maximize public access to the beach. Here, the Commission sought to accomplish this goal by permitting real party in interest property owners on Carbon Beach in Malibu to delete conditions in their residential construction permits that required the creation of "view corridors" and instead substitute the dedication of an undeveloped parcel owned jointly by real parties on adjacent La Costa Beach in Malibu for both public views of and public access to the beach.[1]

Neighbors La Costa Beach Homeowners' Association and various individual members (collectively La Costa) petitioned the superior court for a writ of mandate to overturn the Commission's actions. La Costa argued that

---

[1] The real parties in interest have not appeared on appeal.

the Coastal Act did not allow the Commission to accept off-site mitigation of real parties' view corridor conditions; that proper findings on traffic, pedestrian, and recreational use safety had not been made; and that the Commission had violated the California Environmental Quality Act (CEQA). The trial court granted the petition. We conclude that the Commission acted within the scope of its authority and followed required procedures. Accordingly, we reverse.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The Permits*

As of 1999, the predecessor of real party Gamma Family Trust (Gamma) owned one house, real party Broad Revocable Trust (Broad) owned two adjacent houses, and real party Daly Living Trust (Daly) owned three adjacent houses, all on the seaward side of Pacific Coast Highway in the Carbon Beach area of Malibu. Real parties proffered separate applications to the Commission for permits to demolish the six houses, combine the Broad and Daly holdings into single lots, and build three new residences. The applications were granted and permits were issued in September 1999 to Gamma to demolish one residence and build a new single-family residence of 10,930 square feet, in November 1999 to Broad to demolish two residences and build a new single-family residence of 4,690 square feet, and in April 2000 to Daly to demolish three residences and build a new single-family residence of 14,210 square feet.

The Commission's staff reports on the three projects, which were adopted by the Commission in granting the permits, observed that the Coastal Act provides that maximizing public access to coastal areas is one of the act's basic goals and that the act further requires the visual qualities of coastal areas to be considered and protected. In this regard, the reports discussed lateral (roughly parallel to the shoreline) and vertical (roughly perpendicular to the shoreline) public access.[2] The reports also discussed public view corridors (areas in which building is prohibited and fencing and landscaping is permitted only to the extent that it does not impede views of the ocean from the public street).

The staff reports first noted that limited lateral public access easements existed on the subject parcels before real parties applied for their permits. Real parties, however, had offered to increase the size of these easements to

---

[2]See *Georgia-Pacific Corp. v. California Coastal Com.* (1982) 132 Cal.App.3d 678, 687, footnote 4 [183 Cal.Rptr. 395].

include the entire beach under all tidal conditions. These expanded easements were required as special conditions to the three permits. The staff reports further noted that vertical public access already existed at a site approximately one-half mile from the Gamma and Daly projects and one mile from the Broad project. In addition, offers to dedicate vertical public access existed at other sites along the beach, ranging from 400 to 1,000 feet from real parties' projects.

With respect to public view corridors, the staff reports stated: "Coastal Act [(Public Resources Code)] Section 30251 requires that new development be sited and designed to protect views to and along the ocean and scenic coastal areas and, where feasible, to restore and enhance visual quality in visually degraded areas. The Commission notes that the construction of new residential development which extends over multiple lots also provides for the opportunity to enhance public views, where such views have been significantly degraded by past development . . . . In addition, [the Los Angeles County Malibu/Santa Monica Mountains Land Use Plan] . . . provides that new development on a beachfront property located on the seaward side of Pacific Coast Highway, such as the subject site[s], should reserve 20% of the . . . width of the lineal frontage of the subject site to provide for views of the beach and ocean from Pacific Coast Highway."

In conformity with the Commission's stated policy of requiring view corridors, special conditions were placed on real parties' permits which specified that "[n]o less than 20% of the lineal frontage of the project site shall be maintained as a public view corridor from Pacific Coast Highway to the Pacific Ocean." This translated into a 24-foot public view corridor requirement for the Gamma project, a 20-foot view corridor requirement for the Broad project, and a 36-foot view corridor requirement for the Daly project.

As to the Broad and Daly permits, the view corridor condition further specified that the applicant could seek an amendment to the permit "that provides for offsite mitigation of the public view corridor condition by provision of an offsite public view corridor . . . and an offer to dedicate a vertical public access way in the vicinity of Carbon Beach."

2. *Amendments to the Permits*

All three real parties sought to amend their permits. The requested amendments proposed that the view corridor conditions of real parties' permits be deleted. As mitigation, real parties would grant to the California Coastal Conservancy (the Conservancy) or other appropriate agency an undeveloped

80-foot-wide parcel, representing the combined width of the 24-, 20-, and 36-foot view corridor requirements. The mitigation parcel was located on La Costa Beach, slightly less than one mile from the Gamma and Daly projects and slightly less than one-half mile from the Broad project. The parcel would be deed restricted to provide for public views of and public (vertical) access to the beach.

In a report dated March 30, 2000, the Commission's staff recommended that the three amendments be approved as "consistent with the requirements of the Coastal Act." Among other things, the report noted that the off-site parcel is "immediately east of Carbon Beach" and that "[b]oth Carbon Beach and La Costa Beach are characterized as built-out beachfront areas of Malibu consisting of residential development." The nearest existing vertical access points from the mitigation parcel are 1.3 miles to the east and 1.7 miles to the west. The amendment would provide public views and public access "across the entire 80 ft. wide mitigation parcel in order to mitigate for deletion of the three previously required public view corridors . . . on the original project sites." A coastal development permit application for the construction of a single family residence on the mitigation parcel was submitted in 1998, but the application was returned as incomplete. The parcel now stands empty, separated from Pacific Coast Highway by a chain link fence.

Staff further recommended that access to the site be limited to daytime hours, which would require the installation of a new fence and a gate. Included in the special conditions to be imposed in amended permits was that "[a]ny future development or improvements on the [mitigation] parcel will require a new coastal development permit and shall be limited to those improvements necessary to provide adequate public recreation and access. New development such as gates, stairs, fences, signs, and locks may be approved, subject to the issuance of a coastal development permit, if the Commission finds that such improvements are appropriate to regulate public access on the site."

3.  *Hearing on the Amendments*

A public hearing on the proposed amendments was held on April 12, 2000. Several citizens who reside near the mitigation parcel spoke against the amendments and the Commission considered opposition letters from other residents, as well as from the mayor of the City of Malibu. The opponents were consistent in stating that the mitigation site was not appropriate for public beach access. They first urged that the site's location on a

blind curve created extreme traffic dangers. The mayor stated she had been told by the Los Angeles County Sheriff's Department that 20 percent of all vehicle collisions on Pacific Coast Highway in Malibu had taken place on that stretch of highway. According to a resident's letter, the sheriff's department had designated it the third most unsafe curve on Pacific Coast Highway. In addition, the opponents argued that, unlike Carbon Beach, street parking at the mitigation site is limited and that it is dangerous for pedestrians to cross Pacific Coast Highway in that area. (As the mayor put it, "Proposed access at La Costa Beach is not as user friendly as at Carbon Beach.") Finally, some residents expressed the view that the ocean at the mitigation site is quite dangerous because it is rocky, has a strong riptide, and has a precipitous deep-water shelf.

A Commission staff member who spoke at the hearing explained that "safety on Pacific Coast Highway is always a concern," adding that "there are a number of people who would argue that the entire 26-mile stretch of Pacific Coast Highway through Malibu is too dangerous, and relative to that, there should be no public access anywhere." A representative of the League for Coastal Protection, speaking in support of the amendments, stated that "Malibu always poses the greatest challenge, in terms of public access, particularly this stretch of the coast where there is, actually, hardly any access at all. [¶] And, my concern about the opposition to this particular arrangement is that I think it is the same people who don't want the public to have access to the beach in Malibu. . . . We are getting an equivalent public access, public viewing, and public access in a three-mile stretch of coast where there isn't any."

The Commission chair also acknowledged that Pacific Coast Highway "is a very dangerous highway." She further stated that she is "very familiar with the site" and it "is about as good a site as any site . . . ." "Within a few hundred feet, there is a light, so you can cross over at Carbon Canyon. There is a light, and you can cross, and at Carbon there is lots of parking on the street. That is quite removed from the traffic, and there is a bus in the area. So, this is about as good a place as we can get." Another Commission member stated that "this particular site provides a rather unique opportunity in this area of Pacific Coast Highway, to provide an actual view corridor, as opposed to a, you know, limited view corridor, that as you move down the highway, you are moving down so fast that there is no possible way that you can really see much of anything. [¶] In addition to that, the added benefit of public access is something that persuades me to support the applicants' amendments."

A representative of the Conservancy also spoke at the hearing.[3] He acknowledged that "[e]verywhere the Conservancy has proposed to open accessway in Malibu, the issue of traffic safety has come up as a very big issue." He further explained that "[h]ighway speeds on PCH are increasing. They are very high. Traffic volumes are very high. However, we have on-street parking on other sites along Malibu that operate in a relatively safe manner . . . . [¶] And, in some cases we see public access sites to actually be traffic calming situations, where people have adequate signage that there will be a public facility that people should be slowing for. So, we actually see it that it could actually be a positive contributor to this issue of traffic safety."

The Conservancy representative further stated that the site would not be opened until an access management plan had been adopted. The plan would call for the site to be fenced and gated and would limit public access to certain hours of the day. The representative explained that a hearing was scheduled for later that month at which the Conservancy would hear recommendations to accept the dedication of the mitigation parcel and for a specific access management plan.[4]

Finally, reference was made at the April 12, 2000 hearing to an oral modification of the proposed amendments to which real parties and the Commission had agreed. Under the modification, a condition would be added to require that the mitigation parcel be held in escrow pending any challenge to a decision by the Commission to permit the amendments. If no litigation were filed or if litigation were filed but proved unsuccessful, the deed would be released to the Conservancy. In the event litigation precluded the parcel from being opened to public access, the deed would be returned to real parties and real parties would pay the Conservancy the greater of $1 million or, if the parcel were to be sold within one year of return, the net proceeds of that sale. The money would be used to open public access elsewhere in Malibu.

The hearing concluded with the Commission voting unanimously to approve the proposed amendments to the permits, including the oral modification.

---

[3]As stated on its website: "The California Coastal Conservancy, established in 1976, is a state agency that uses entrepreneurial techniques to purchase, protect, restore, and enhance coastal resources, and to provide access to the shore. [It works] in partnership with local governments, other public agencies, nonprofit organizations, and private landowners." (<http://www.coastalconservancy.ca.gov/About/about.htm> [as of Aug. 23, 2002]; see also Pub. Resources Code, § 31000 et seq.)

[4]On April 27, 2000, the Conservancy voted to accept the mitigation parcel for public access. According to La Costa, that decision has been challenged in Los Angeles Superior Court, and the parties have stipulated to a stay of those proceedings pending the outcome of the instant appeal.

#### 4. *Revised Findings*

On May 24, 2000, Commission staff issued proposed revised findings in support of the Commission's April 12 approval of real parties' amended permits.[5] The proposed revised findings included much of the same information as was set forth in the original staff report. Also included was the following:

"[T]he Commission notes that the proposed mitigation site constitutes a unique opportunity to provide a broad uninterrupted view corridor, in addition to public access, in an area of Malibu where public views and public access to the beach have been significantly limited by private residential development. In regards to concerns that the provision of public access and views at the proposed mitigation site would result in potential traffic and pedestrian hazards, the Commission notes that, due to the nature of Pacific Coast Highway as a relatively hazardous roadway, no beachfront area in Malibu along Pacific Coast Highway is without the potential for hazard. In the case of the proposed mitigation site, the Commission notes that the site is located along a relatively straight section of the highway with adequate sight distance and that there is adequate area for parking along the beachfront side of the street. In addition, a stop light with a pedestrian crossing is located a few hundred feet to the west of the site. The Commission further notes that the subject site is typical for beachfront lots along Pacific Coast Highway and that use of the mitigation site for public access and viewshed presents no greater hazard to traffic and pedestrians than the use of any other public vertical accessways which are open and available for public use which are located along Pacific Coast Highway in the Malibu area. Further, in regards to concerns that the coastal waters near the proposed mitigation site are subject to hazardous currents and that, therefore, the mitigation site is not suitable for the provision of public access to the beach from the highway, the Commission notes that the offshore currents near the subject site are substantially similar to other areas of the Malibu coastline. Therefore, the Commission finds that the availability of public access to the sandy beach at the subject site does not constitute a greater hazard than the provision of public access to the sandy beach anywhere else along the Malibu coastline."

---

[5] In this document, staff noted that because additional language had been added to the condition of the amendment regarding the mitigation parcel, "revised findings are necessary to reflect the action taken by the Commission. . . . Comments from the public concerning the findings will be limited to discussion of whether the findings reflect the action of the Commission." (See Cal. Code Regs., tit. 14, § 13096, subd. (b) [proposed revised findings should be prepared by Commission staff if Commission action substantially differs from reasons, findings, and conclusions set forth in the original staff report].)

With respect to the modification requiring a minimum $1 million payment if the mitigation site were not dedicated for public access, the proposed revised findings stated that $1 million was the approximate value of the proposed parcel, and that the money would be paid to the Conservancy and "used to open public accessways in Malibu or to obtain public access in Malibu. This provision ensures that, in the event that a court precludes opening of the proposed mitigation site . . . to the public, adverse effects to public views resulting from the underlying residential projects, as amended, will still be adequately mitigated."

The last section of revised findings (as of the original staff report on the proposed amendment) addressed CEQA. The rule was cited that CEQA prohibits a proposed development from being approved if there are feasible alternatives or mitigation measures that would substantially lessen any significant adverse effects of a project on the environment. Staff proposed a finding that the projects as amended would not have significant adverse effects on the environment, were adequately mitigated, and were consistent with CEQA and the Coastal Act.

The proposed revised findings were unanimously adopted by the Commission at a public hearing held on June 13, 2000.

5. *Writ Petition*

Meanwhile, on May 12, 2000, La Costa filed a petition for writ of mandate. As pertinent to this appeal, La Costa argued that the Commission improperly determined that the off-site parcel offered by real parties provided sufficient mitigation for the elimination of their view corridor requirements and that the Commission's findings on the safety of the mitigation parcel for motorists, pedestrians and recreational users were not supported by substantial evidence. La Costa further argued that the Commission violated CEQA by failing to conduct an adequate environmental analysis. The Commission responded that its decisions were supported by substantial evidence, it had not failed to make any required findings, and its environmental analysis complied with CEQA.

La Costa's petition was granted on May 10, 2001. In its minute order, the trial court found in part that " 'offsite mitigation[]' violates the basic purposes of the Coastal Act and is not permitted by that act." "[T]he practice used by real parties in this case is not permitted by the act because it fails to maximize public access to and along the coast as required by [Public Resource Code] Section 30001.5 [subdivision] (c)." With respect to public access to the beach, the trial court found "there is no evidence that such

access will be, or is likely to be, provided. . . . Without such evidence there is nothing before the court to show that the La Costa Beach lot will provide the public with anything more than it now provides: an eighty foot wide view of the ocean from Pacific Coast Highway."

Judgment granting a peremptory writ of mandate commanding the Commission to rescind its approval of amendments to applicants' permits was filed on June 4, and the writ was issued on June 12, 2001. The Commission filed a timely notice of appeal.

DISCUSSION

### 1.  *Standard of Review*

Public Resources Code section 30801 gives an "aggrieved person," defined as anyone who appears at a public hearing or otherwise informs the Commission of concerns if unable to appear at the hearing, the right to judicial review by filing a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5. "The inquiry in such a case shall extend to the questions of whether the [Commission] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [Commission] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Id.*, § 1094.5, subd. (b).) "Where it is claimed that the findings are not supported by the evidence . . . , abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (*Id.*, § 1094.5, subd. (c).)

■ " 'The "in light of the whole record" language means that the court reviewing the agency's decision cannot just isolate the evidence supporting the findings and call it a day, thereby disregarding other relevant evidence in the record. [Citation.] Rather, the court must consider all relevant evidence, including evidence detracting from the decision, a task which involves some weighing to fairly estimate the worth of the evidence. [Citation.]' [Citations.] That limited weighing is not an independent review where the court substitutes its own findings or inferences for the agency's. [Citation.] "It is for the agency to weigh the preponderance of conflicting evidence [citation]. Courts may reverse an agency's decision only if, *based on the evidence before the agency*, a reasonable person could not reach the conclusion reached by the agency." [Citation.]' [Citation.]

■ "Finally, '[o]ur role here is precisely the same as that of the trial court. " '[I]n an administrative mandamus action where no limited trial de

novo is authorized by law, the trial and appellate courts occupy in essence identical positions with regard to the administrative record, exercising the appellate function of determining whether the record is free from legal error. [Citations.]' [Citation.] Thus, the conclusions of the superior court, and its disposition of the issues in this case, are not conclusive on appeal. [Citation.]" [Citation.]' [Citation.]" (*Sierra Club v. California Coastal Com.* (1993) 19 Cal.App.4th 547, 557 [23 Cal.Rptr.2d 534].)

## 2. *Propriety of Off-site Mitigation*

■ "In California, one of the conditions of obtaining a permit for development within the coastal zone is the procurement of a coastal permit." (*Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006, 1028 [73 Cal.Rptr.2d 841, 953 P.2d 1188].) The Commission contends that amended permits were properly issued in this case. La Costa disagrees, arguing that the amendments were improper because there is no authority "for the practice of trading on-site for off-site view mitigation . . . ." The primary authority on which both parties rely is the Coastal Act.

The Coastal Act contains a legislative declaration that one of the "basic goals of the state for the coastal zone" is to "[m]aximize public access to and along the coast and maximize public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of private property owners." (Pub. Resources Code, § 30001.5, subd. (c).) Chapter 3 of the Coastal Act (§ 30200 et seq.), in conjunction with the act's stated goals, "constitute[s] the standards by which the adequacy of . . . proposed developments . . . are determined." (*Id.*, § 30200, subd. (a).) Chapter 3 includes directives that "maximum access . . . and recreational opportunities shall be provided for all the people consistent with public safety needs and the need to protect public rights, rights of private property owners, and natural resource areas from overuse." (*Id.*, § 30210.) "Development shall not interfere with the public's right of access to the sea . . . ." (*Id.*, § 30211.) Vertical public access to the beach shall be provided except where adequate access exists nearby, or access would be inconsistent with public safety, or the needs of security, agriculture, or the protection of fragile coastal resources. (*Id.*, § 30212.) And "[t]he scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance. Permitted development shall be sited and designed to protect views to and along the ocean and scenic coastal areas . . . and, where feasible, to restore and enhance visual quality in visually degraded areas." (*Id.*, § 30251.)

Although the provisions of the Coastal Act establish the objective of maximizing public access to the beach, neither the act nor its associated

administrative regulations specify how this objective is to be achieved. Here, the Commission first sought to comply with the Coastal Act's directives by including conditions of increased lateral public access and public view corridors on real parties' parcels. The Commission then received a proposal from real parties that it determined would advance the goal of maximizing accessibility to an even greater extent—exchanging the requirement of view corridors on real parties' parcels for the dedication of a nearby undeveloped 80-foot-wide beachfront parcel. Not only would this mitigation parcel have the advantage of a permanent, uninterrupted 80-foot view of the ocean, it would be dedicated for public access to the beach.

La Costa argues that the Commission violated the Coastal Act because the language of Public Resources Code section 30251 (quoted above) "specifically requires the Commission to condition development on appropriate 'siting' and 'designing' of the project itself, and, thus, requires that view be provided on the project site." (Original underscoring.) La Costa further argues that, because Carbon Beach was determined to be a visually degraded area, section 30251 also prohibits the mitigation from taking place off site, at La Costa Beach. Contrary to La Costa's reading of the statute, nothing in section 30251 "requires the Commission to condition development" at any specific site. And the staff report on the proposed amendment reflects that visual degradation extends throughout the area in that "[b]oth Carbon Beach and La Costa Beach are characterized as built-out beachfront areas of Malibu consisting of residential development."

The Commission, on the other hand, asserts that off-site mitigation is specifically authorized by the Coastal Act. It relies on Public Resources Code section 30212, which states that vertical access is not required of a development project if such access exists nearby, and on section 30212.5, which requires the distribution of public facilities throughout an area "[w]henever appropriate and feasible." The Commission further relies on *Carstens v. California Coastal Com.* (1986) 182 Cal.App.3d 277 [227 Cal.Rptr. 135]. There, a utility company sought approval from the Commission to build nuclear power plants on San Onofre State Beach. To mitigate the loss of beach access occasioned by the project, approval was granted on condition that the company pay $3 million for construction of campsites on an adjacent beach and convey two parcels of beachfront property in the City of Carlsbad. (*Id.* at pp. 284, 291.) A citizen's challenge to the mitigation conditions on various grounds (not including the contention here that off-site mitigation is per se improper) was rejected in the trial court. On appeal, the *Carstens* court concluded that the administrative record showed that the Commission had adequately evaluated the relevant considerations under the

Coastal Act. (*Carstens v. California Coastal Com., supra*, 182 Cal.App.3d at pp. 290-294.)

The statutory and case law relied on by the Commission does not expressly authorize the type of off-site mitigation permitted here. Nonetheless, such authority arises from the Commission's mandate to maximize public access whenever possible. We find nothing in the Coastal Act or in any other statute, regulation, or legal opinion that would circumscribe the Commission's exercise of discretion in this case and forbid it to conclude that the public will receive a greater benefit from the mitigation parcel, with its uninterrupted 80-foot view and public beach access, than from retaining separate view corridors adjacent to the residences that real parties have been authorized to build.

The provision allowing an "in lieu" cash payment if litigation precludes the mitigation lot from being used for beach access does not alter our view. We disagree with the conclusion of the trial court that "there is no evidence that such access will be, or is likely to be, provided." To the contrary, the Commission determined that the mitigation parcel was appropriate for public access and the Conservancy agreed to assume ownership of the parcel and take responsibility for implementing an access plan. La Costa has not demonstrated that any serious flaw exists in either the Commission's decision or the Conservancy's acceptance of the parcel that would undermine the expectation that access will ultimately be provided to the public.

We recognize, as La Costa observes, that if litigation prevents the mitigation parcel from being dedicated for public access, the Commission will have effectively allowed real parties to rid themselves of the view corridor conditions on their parcels for the payment of cash. But we also recognize real parties have purchased the mitigation parcel and tendered it to the public in good faith. If the neighbors manage to prevent its public use, only then will resort be made to what is effectively a $1 million insurance policy for coastal access. The Commission's approval of the amendments presents a rare opportunity to provide the public with beach access in an area where such access is practically nonexistent. The protection provided by the in lieu payment condition does not detract from the Commission's efforts to properly do its job.

3. *Sufficiency of Findings*

The Commission contends that its decision was supported by substantial evidence. La Costa responds, in part, by asserting that the evidence did not support the Commission's "finding that access from the [mitigation] lot is

safe for pedestrians and motorists" and its "finding that the beach adjacent to the [mitigation] lot is safe for recreation . . . ." La Costa's characterization of the issue does not adequately acknowledge either the nature of the Commission's decision or the appropriate scope of judicial review.

The findings that La Costa complains were not supported by substantial evidence were in fact never made. One reason is that Public Resources Code section 30214, subdivision (a), on which La Costa relies, does not require that the Commission make specific findings such as those suggested by La Costa.[6]

At the outset, we note that by approving real parties' proposed amendments, the Commission did not authorize use of the mitigation parcel for public access in its current condition. Rather, acceptance of the parcel as embodied in the amendments was contingent on the Conservancy or other agency erecting an appropriate fence and gate to limit access and the issuance of a new coastal development permit for improvements "such as gates, stairs, fences, signs, and locks" that are "necessary to provide adequate public recreation and access." It is only when the new permit is granted that the public will gain vertical access to the mitigation parcel. That new permit will, of course, be subject to challenge by "[a]ny aggrieved person" under the Coastal Act. (Pub. Resources Code, § 30801.)

As to the findings on which the amended permits were based, La Costa argues the Coastal Act was violated because the evidence it proffered regarding safety considerations precluded the possibility of the mitigation parcel being used for public access. We view the evidence differently.

Opponents of the amendments asserted that the mitigation parcel presented greater danger for traffic and pedestrians than other areas of Malibu. But staff reports, statements made at the public hearing, and photographs proffered to the Commission (which we have viewed as part of the administrative record) demonstrate that street parking is available at the mitigation site, there is a Metropolitan Transit Authority bus stop immediately adjacent

---

[6]Public Resources Code section 30214, subdivision (a), provides in relevant part that "public access policies . . . shall be implemented in a manner that takes into account the need to regulate the time, place, and manner of public access depending on the facts and circumstances in each case including, but not limited to, the following: [¶] (1) Topographic and geologic site characteristics. [¶] (2) The capacity of the site to sustain use and at what level of intensity. [¶] (3) The appropriateness of limiting public access to the right to pass and repass depending on such factors as the fragility of the natural resources in the area and the proximity of the access area to adjacent residential uses. [¶] (4) The need to provide for the management of access areas so as to protect the privacy of adjacent property owners and to protect aesthetic values of the area by providing for the collection of litter."

to it, and a traffic signal is located a short distance away. Indeed, as explained by the Conservancy representative, in some cases the existence of signs showing the location of a public access site actually has a calming effect on traffic. Opponents also said that the ocean in the area of the mitigation parcel is rocky, has a strong riptide, and has a precipitous deep water shelf. But no evidence was before the Commission that would indicate that the ocean in that area is more rocky, has a stronger riptide, or has a more precipitous deep-water shelf than any other area in Malibu.

Finally, La Costa complains that the revised findings to the effect that traffic, pedestrian, and ocean safety did not constitute an impediment to dedication of the mitigation parcel for public access were post hoc rationalizations of a decision that was not otherwise supported. We disagree. The revised findings did nothing more than reflect in writing the rationale that the Commissioners and staff articulated on the record at the April 12, 2000 public hearing.

Based on the foregoing, we conclude that substantial evidence supported the Commission's findings and its decision to accept the mitigation parcel for public views and public access.

4. *CEQA*

La Costa also contends that the Commission violated CEQA (Pub. Resources Code, § 21000 et seq.) by failing to comply with both CEQA's and its own requirements and regulations. The contention has no merit.

The regulatory program of the Commission in dealing with the consideration and granting of coastal development permits has been certified by the Secretary of the California Resources Agency to be exempt from the CEQA requirement of preparing an environmental impact report (EIR) or a negative declaration. The Commission remains subject to other provisions of CEQA, such as the policy of avoiding significant adverse effects on the environment where feasible. (Cal. Code Regs., tit. 14, §§ 15250, 15251; see Pub. Resources Code, § 21080.5; *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 114 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) In this regard, the Commission is required, among other things, to disapprove of a project if alternatives or feasible environmental mitigation measures are available (Pub. Resources Code, § 21080.5, subd. (d)(2)(A)), to include guidelines for the orderly evaluation of proposed activities (*id.*, § 21080.5,

subd. (d)(2)(B)), to consult with all public agencies that have jurisdiction over the proposed project (*id.*, § 21080.5, subd. (d)(2)(C)), and to respond in writing to significant environmental points raised in the evaluation process (*id.*, § 21080.5, subd. (d)(2)(D)).

The document used as a substitute for an EIR or negative declaration must include, among other things, "[a] statement that the agency's review of the project showed that the project would not have any significant or potentially significant effects on the environment and therefore no alternatives or mitigation measures are proposed to avoid or reduce any significant effects on the environment. This statement shall be supported by a checklist or other documentation to show the possible effects that the agency examined in reaching this conclusion." (Cal. Code Regs., tit. 14, § 15252, subd. (b)(2).)

"In order to claim the exemption from CEQA's EIR requirements, an agency must demonstrate strict compliance with its certified regulatory program. [Citations.]" (*Mountain Lion Foundation v. Fish & Game Com.*, *supra*, 16 Cal.4th at p. 132.) Although Evidence Code section 664 creates a presumption that a duty is regularly performed, "such a presumption is misplaced in a case . . . where the record affirmatively shows the Commission failed to satisfy every requirement of its certified regulatory program. [Citations.]" (*Mountain Lion Foundation v. Fish & Game Com., supra,* 16 Cal.4th at p. 132.) CEQA specifically recognizes that there may be inconsistencies or conflicts between its provisions and the Coastal Act and provides that in such a situation the Coastal Act controls. (Pub. Resources Code, § 21174.)

La Costa contends that the Commission was derelict in failing to consult with public agencies such as the Los Angeles County Sheriff's Department or the City of Malibu before taking action on the proposed amendments. But under the Commission's regulations, consultation with other agencies is not required where, as here, the project is for a public purpose. (Cal. Code Regs., tit. 14, § 13053, subd. (a)(1).) Nor is La Costa correct in asserting that the Commission attempted to comply with its CEQA obligations by boilerplate findings that no feasible alternative or mitigation measures would lessen significant adverse environmental effects. The findings about which La Costa complains were made only after a thorough review of the project and its potential effects on the environment. Contrary to La Costa's assertion, nothing in the record demonstrates that the Commission failed to provide adequate public notice of hearings or evaluate the impact of use of the beach in terms of absence of restroom facilities, the presence of litter, or the

potential fragility of a tide pool that one opponent of the amendments urged the Commission to consider.

## DISPOSITION

The judgment is reversed. The California Coastal Commission is entitled to recover costs on appeal.

Spencer, P. J., and Ortega, J., concurred.